| | |
|---|---|
| STEFANIE MAUBACH,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    Case No. 1:17-cv-921<br>) |
| CITY OF FAIRFAX,<br>    Defendant. | )<br>)<br>) |

# MEMORANDUM OPINION

At issue on summary judgment in this disability discrimination case is whether the undisputed record facts reflect that defendant is entitled to summary judgment on plaintiff's reasonable accommodation and discharge claims. Specifically, plaintiff claims (i) that defendant failed to accommodate her disability by denying plaintiff the opportunity to bring her dog, Mr. B, to work, and (ii) that she was terminated because of her disability. Defendant counters, arguing that plaintiff's preferred accommodation was not reasonable in light of the allergy issues created by Mr. B's presence in the workplace, and that defendant offered other reasonable alternatives as part of the ADA mandated interactive process, such as substituting a hypoallergenic dog for Mr. B or working the day shift, both of which plaintiff refused to consider. Defendant also contends that plaintiff was discharged not because of any disability, but because a psychologist evaluation concluded that she was not psychologically suited for her position as a 911 dispatcher.

The matter has been fully briefed and argued and is now ripe for disposition.

## I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The following statement of undisputed material facts is based on the defendant's statement of undisputed

1

material facts and plaintiff's response.[1] The remainder of the record and the parties' statements of additional facts were also scoured for facts that might be viewed as in conflict with the facts stated here.

- Defendant, the City of Fairfax, employed plaintiff, Stefanie Maubach, as a dispatcher. Plaintiff's responsibilities including answering emergency calls, receiving and transmitting radio and telephone messages, and dispatching police and other emergency personnel when needed. Plaintiff worked the night shift with another dispatcher. Lt. Martin Nachtman (Nachtman) supervised plaintiff.

- Plaintiff worked in defendant's Emergency Operations Center (EOC), which is a bulletproof glass enclosed and locked space containing highly sensitive equipment and multiple work stations. Each station contains the necessary equipment to allow plaintiff, as a dispatcher, to perform her duties.

- In February 2016, plaintiff asked Nachtman if she could bring her dog to work. Plaintiff told Nachtman that having her dog, Mr. B,[2] at work would help plaintiff avoid panic attacks, which had already caused plaintiff to miss work. Nachtman denied plaintiff's request. At that time, Nachtman was unaware that plaintiff suffered a disability.

- A little over a month later, on April 22, 2016, plaintiff visited a professional counselor to discuss her emotional health. On May 11, 2016, plaintiff returned to the counselor and reported having suffered a panic attack at a store.

- Later in the month, on May 23, 2016, plaintiff returned to the counselor and this time reported having a panic attack at work because she had seen a spider. Plaintiff asked the counselor about the possibility of using Mr. B as an emotional support animal. The counselor agreed to write a letter recommending that plaintiff be allowed to bring Mr. B to work with her to calm plaintiff when she suffered a panic attack.

- Between May 23 and June 6, plaintiff contacted defendant's personnel director concerning plaintiff's request to bring her dog to work. Plaintiff told the personnel director that Mr. B was a registered service animal. Plaintiff also advised the personnel director that she needed Mr. B to help her drive to and from work as a precaution in the

---

[1] Pursuant to Local Rule 56(B) and the Rule 16(b) Scheduling Order issued in this case, a motion for summary judgment must contain a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists. *See Maubach v. City of Fairfax*, No. 1:17-cv-921 (E.D. Va. Oct. 23, 2017) (Order). Defendant complied with Local Rule 56(B) and the Scheduling Order. Plaintiff did not fully comply, choosing instead to list only the facts plaintiff disputed, but citing no properly admissible record evidence disputing any particular fact. In any event, a thorough review of the record reveals no triable issues of material fact.

[2] Mr. B, who was thirteen years old during the events leading up to this case, is now, lamentably, on his last legs.

2

event plaintiff received a call from the man plaintiff alleges molested plaintiff's daughter, and plaintiff suffered a panic attack as a result of the call.

- The personnel director discussed the request with defendant's Risk Manager and plaintiff was allowed to bring Mr. B to work on a trial basis. Plaintiff provided the personnel director with Mr. B's vaccination and service animal registration records.

- On June 6, 2016, after taking Mr. B to her counselor's office, plaintiff's counselor gave plaintiff a letter recommending that plaintiff be allowed to bring Mr. B to work as an emotional support animal.

- Plaintiff's supervisor, Nachtman, was on vacation at the time plaintiff was discussing bringing Mr. B to work on a trial basis with the personnel director. When Nachtman returned from vacation, he discovered that plaintiff had brought Mr. B to work. Nachtman also discovered that the EOC was covered with clumps of dog fur and dander and that plaintiff had left Mr. B's bed in the EOC. Nachtman is allergic to dogs and began suffering allergic reactions to Mr. B's fur and dander after entering the EOC. These allergic reactions included sneezing, watery eyes, coughing, and congestion.

- Later in June, Nachtman received an email from a day-shift dispatcher, in which this dispatcher complained about allergic reaction to Mr. B's fur and dander.

- Allergies were not the only problem caused by Mr. B's presence in the workplace. The morning after one of plaintiff's night shifts, a supervisor of patrol officers advised Nachtman that plaintiff had allowed an inexperienced police officer to monitor the EOC alone while plaintiff was walking Mr. B. Although two night shift dispatchers would ordinarily have been on duty, only one was present on the night in question because the other night shift dispatcher was out sick. Nachtman expressed concern that plaintiff's need to take Mr. B on walks might create an unsafe environment if no qualified dispatcher were present for a 911 call. Nachtman contacted defendant's personnel director and complained that Mr. B was causing allergies in the EOC and that plaintiff's need to care for Mr. B during her shift might put officers or civilians at risk because plaintiff would leave her dispatcher post in order to walk or care for Mr. B.

- Nachtman's complaint, the personnel director consulted with Fairfax's legal counsel. On June 29, 2016, the personnel director asked plaintiff to submit documentation regarding plaintiff's request to bring Mr. B to work. Plaintiff responded by providing the personnel director with the note from her counselor recommending that plaintiff be allowed to bring "an emotional support animal" to work. After a few additional email exchanges, defendant's personnel director determined that Mr. B was qualified as an emotional support animal, and the personnel director requested additional information regarding plaintiff's request for an accommodation pursuant to the ADA.

- On July 7, 2016, the personnel director confirmed plaintiff's request for accommodation in a phone call. In a telephone call, plaintiff informed the personnel director that she would not return to work until and unless she was allowed to return to the workplace with Mr. B.

- On July 8, 2016, defendant's personnel director asked plaintiff whether she could return and if so when. Plaintiff responded that she could not return to work without Mr. B and that she needed to take leave. Plaintiff then applied for short term disability and FMLA leave, submitting the requisite paperwork on August 1, 2016.

- After the telephone calls with plaintiff, the personnel director notified Nachtman that he would need to find someone to cover plaintiff's shift while plaintiff was on disability and FMLA leave. For the first few weeks, Nachtman assigned additional coverage shifts to other dispatchers to account for plaintiff's absence.

- Eventually, Nachtman reassigned a day shift dispatcher to the night shift in order to offer plaintiff the opportunity to work the less stressful day shift. The day shift position offered the same pay and benefits, but gave plaintiff more flexibility if she needed time off to accommodate her disability because there would always be two other assigned dispatchers who could cover for plaintiff in the event plaintiff needed to take time off as a result of her disability.

- On September 9, 2016, plaintiff contacted a psychiatrist to ask if the psychiatrist would sign paperwork recommending that plaintiff receive another six weeks off from work. Plaintiff's psychiatrist signed the paperwork, which indicated that plaintiff could not return to work until October 17, 2016.

- On September 12, 2016, plaintiff again requested permission to bring Mr. B to work.

- On September 15, 2016, defendant's personnel director called plaintiff to discuss plaintiff's continuing FMLA leave. The personnel director informed plaintiff that plaintiff was going to run out of FMLA leave. On this phone call, plaintiff discussed the day shift accommodation she was offered. Plaintiff told defendant's personnel director that the day shift was not acceptable to plaintiff because plaintiff wanted to work with a friend of hers who only worked the night shift. Defendant's personnel director told plaintiff that plaintiff would need medical documentation verifying that plaintiff required night shift work, but that defendant could not guarantee that plaintiff would receive night shift work. Plaintiff then asked her doctor for another note saying that plaintiff needed to work the night shift so that she could work with a particular dispatcher.

- Based on plaintiff's extended leave and plaintiff's statements to defendant about her mental health, defendant requested that plaintiff submit to a fitness for duty independent medical review.

- Plaintiff complied with this request and scheduled a psychological evaluation with Dr. John Wires (Dr. Wires), a clinical psychologist at The Child & Family Counseling Group, P.L.C., for December 6, 2016. As a result of his examination of plaintiff, Dr. Wires informed defendant that plaintiff was not psychologically fit for duty as a 911 emergency dispatcher. Dr. Wires also advised plaintiff that she could seek a second opinion with respect to her fitness for duty if she wished. Plaintiff did not seek a second opinion.

- On December 8, 2016, defendant told plaintiff that plaintiff was not psychologically cleared to work as a dispatcher and that her position would be filled by another.

- After plaintiff was informed about the results of her psychological evaluation, she never returned to work.[3]

- On December 21, 2016, plaintiff filed an EEOC complaint. Following plaintiff's complaint, defendant offered plaintiff a new accommodation, namely to bring a hypoallergenic dog to work in place of Mr. B. Plaintiff refused, stating she would not be "bullied" into bringing a particular breed of dog to work, that there is no such thing as a hypoallergenic dog, and in any event, that she did not have the money to buy a hypoallergenic dog.

**II.**

The summary judgment standard, which the parties do not dispute, is too well-settled to merit extended discussion. As Rule 56, Fed. R. Civ. P., makes clear, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." And it is settled that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. On the other hand, if the record reflects a genuine factual dispute, summary judgment is precluded. A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But importantly, the party opposing summary judgment may not rest upon mere

---

[3] The record does not disclose a precise termination date, nor do the parties argue that there is a dispute of material fact as to the precise date of discharge. It appears from the record that plaintiff went on FMLA leave in July 2016 and never returned to work after that date. Plaintiff's FMLA leave expired in August, but plaintiff was not terminated at that time. Then, after Dr. Wires determined that plaintiff was no longer medically fit for duty as an emergency dispatcher, plaintiff was told on December 8, 2016 that her position would be filled with a new applicant. Although December 8, 2016 could be considered plaintiff's termination date, plaintiff's deposition testimony regarding her eligibility for unemployment benefits suggests that plaintiff was not officially terminated until sometime later. Maubach Dep. at 231:15-232:2 ("the unemployment has to go through HR with the City, they decided that was a good day to let me go. . . . I received my termination notice"). Ultimately, plaintiff's precise date of termination is immaterial to the summary judgment analysis as either a December 8, 2016 termination date or the later official termination date were supported by the same stated reason for termination, namely that plaintiff was no longer medically fit for duty as an emergency dispatcher.

5

allegations and denials, and must instead "set forth specific facts showing that there is a genuine issue for trial." *Id.* And further, these specific facts must be shown to exist in the record in legally admissible form. Finally, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

### III.

#### A.

Plaintiff's first claim is that defendant failed to provide her with a reasonable accommodation, namely bringing Mr. B to work as an emotional support animal, in violation of the ADA. Analysis of plaintiff's claim properly begins with the applicable statutory provisions of the ADA. In this respect, Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability" by

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A).

And a "qualified individual" is statutorily defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" § 2111(8). Also statutorily defined is "reasonable accommodation" which is an accommodation that "enables an individual with a disability . . . to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(o)(1)(ii). The statute expressly contemplates that a reasonable accommodation may require job restructuring, 42 U.S.C. §

12111(9)(B), but an employer is not required to grant an accommodation unless it would enable the employee to perform "all essential job functions of [the] position." *Jacobs*, 780 F.3d at 581.

Given these governing principles, settled precedent makes clear that to establish a prima facie case for failure to accommodate under the ADA, plaintiff must show (i) that she had a disability within the meaning of the ADA, (ii) that defendant knew of plaintiff's disability, (iii) that with a reasonable accommodation plaintiff could perform the essential functions of her position, and (iv) that defendant refused to make such an accommodation. *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015). At the summary judgment stage, plaintiff "need only show that 'an accommodation' seems reasonable on its face,' and then the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship.'" *Id*.

Importantly, it is clear that the law requires that the parties engage in an interactive process for the purpose of identifying a reasonable accommodation that can meet the genuine needs of both the employee and the employer. 16 C.F.R. § 1630.2(o)(3). The requirement that the employer and employee engage in a good faith, interactive process to identify a reasonable accommodation is "implicit in the fourth element" of a plaintiff's prima facie case for failure to accommodate. *Haneke v. Mid-Atlantic Capital mgmt..*, 131 Fed. Appx. 399, 400 (4th Cir. 2005) (unpublished). During the interactive process "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 Fed. Appx. 314, 323 (4th Cir. 2011) (unpublished) (quoting *Beck v. Univ of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). Instead, courts are required to "look for signs of failure to participate in good faith." *Id.* And it is clear

7

that where a "party [] obstructs or delays the interactive process" that party is not acting in good faith. *Id.*

Although the Fourth Circuit has not issued a published opinion addressing the obligation of an employee – as opposed to an employer – to engage in the interactive process, the Fourth Circuit's unpublished *Crabill* decision and multiple circuit courts in published opinions have held that an employer cannot be held liable under the ADA where it is the employee who refuses to engage in, or who causes the breakdown of, the requisite interactive process to determine a reasonable accommodation. *See E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) ("If an employer engages in the interactive process with the employee in good faith, for the purposes of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations.").[4] For example, in *E.E.O.C. v. Kohl's*, an employee with diabetes requested an accommodation in the form of a nine-to-five work schedule that covered the mid-day. *Id.* at 130. When the employee's supervisor informed the employee that the company could not offer her a nine-to-five schedule, the employee became angry and told her supervisor she would need to quit unless she was accommodated with a nine-to-five schedule. *Id.* The employer offered to discuss other accommodations, but the employee quit and then sued the employer. On these facts, the First Circuit held that the employee's failure to "contemplate alternative accommodations" in the face of the employer's continued – albeit "ham-handed" –

---

[4] *See also Jackson v. City of Chicago*, 414 F.3d 806, 814 (7th Cir. 2005) (holding that an employer cannot be liable for a failure to accommodate where the plaintiff was responsible for the breakdown of the interactive process); *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 740 (5th Cir. 1999) ("In light of these undisputed facts, no reasonable jury could find that responsibility for the failure of the process to reasonably accommodate [plaintiff] rested with anyone but herself. Accordingly, the district court was correct to grant judgment as a matter of law in favor of [defendant]."); *Beck*, 75 F.3d at 1135, 1137 ("But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow"); *Templeton v. Neodata Services, Inc.*, 162 F.3d 617 (10th Cir. 1998) (same).

8

offers to reach an accommodation constituted bad faith and meant that the employer could not be held liable for a failure to accommodate. *Id.* at 133. As the First Circuit further observed, the employers "refusal to give [plaintiff]'s specific requested accommodation does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential accommodations." *Id.* Ultimately, the First Circuit concluded that the employee's "refusal to participate in further discussions with [the employer] was not a good faith effort to engage in an interactive process" and summary judgment in favor of the employer in those circumstances was appropriate. *Id.*

These principles, applied here, point persuasively to the conclusion that the plaintiff here did not participate in good faith in the interactive process to identify a reasonable accommodation. Plaintiff requested permission to bring Mr. B to work and defendant allowed plaintiff to bring Mr. B to work on a trial basis. After defendant discovered that Mr. B was imposing a hardship on other employees with allergies, and that Mr. B's presence had caused plaintiff to leave her dispatcher post without proper coverage, defendant asked plaintiff to consider two alternatives. First, defendant offered plaintiff the option to work the day shift, where other dispatchers could cover for plaintiff in the event that plaintiff needed to take time off to address her disability. Second, defendant offered to allow plaintiff to bring a hypoallergenic dog to work to act as an emotional support animal. The undisputed record facts demonstrate that plaintiff refused these proffered accommodations. Instead, plaintiff stated that she would not be "bullied" into a particular breed of dog and demanded that she be allowed to bring Mr. B to work, and also demanded on working the night shift because plaintiff preferred working with her nightshift co-worker. Maubach Dep. at 260-61; Greer Decl. ¶ 13.

Plaintiff is not entitled to her preferred accommodation; she is only entitled to a reasonable accommodation. *Reyazuddin*, 789 F.3d at 415-16 ("An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested. Rather, the employer may provide an alternative reasonable accommodation.").[5] Here, as in *Kohl's*, defendant offered plaintiff alternative accommodations which plaintiff refused to even consider. Defendant sought to present alternatives that would meet plaintiff's needs while avoiding the hardships Mr. B's presence imposed, and rather than consider these alternatives plaintiff refused to discuss any accommodation other than bringing Mr. B to work and working the night shift. Where, as here, and as in *Kohl's*, an employee causes the interactive process to break down by insisting on a particular accommodation, an employer cannot be held liable under the ADA. As such, plaintiff's reasonable accommodation claim fails as a matter of law.

But even assuming, *arguendo*, that plaintiff had engaged in the interactive process in good faith, that would not end the analysis because the ADA does not require an employer to make an accommodation if that accommodation would impose an undue hardship under the particular circumstances of the case. *Reyazuddin*, 789 F.3d at 414.[6] Here, the undisputed

---

[5] *See also Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.").

[6] The parties spill a significant amount of ink on the question whether Mr. B is a "service animal" under the ADA. There appears to be a difference in the law between services animals on the one hand and emotional support or comfort animals on the other. Titles II and III of the ADA, which address disability discrimination in the provision of public services and in public accommodations, respectively, have specific regulations addressing the distinction between service animals and emotional support animals. These regulations provide protections for use of service animals, and exclude emotional support animals from coverage under the ADA. Specifically, the Department of Justice regulations define a service animal as "any dog individually trained to do work or perform tasks for the benefit of an individual with a disability." 28 C.F.R. § 35.104. The work a service animal performs "must be directly related to the individual's disability" and incudes "helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors" but does not include "the provision of emotional support, well-being, comfort, or companionship." *Id*. Thus, an animal whose only purpose is emotional

10

material facts demonstrate that Mr. B's presence in the EOC imposed an undue hardship. To begin with, Mr. B was causing several individuals, including a day shift dispatcher and plaintiff's supervisor, to suffer from allergies. The allergic reactions these individuals suffered included significant discomfort and there is no record evidence that shows that plaintiff could have taken steps to alleviate or minimize the allergies.[7] Maubach presents an affidavit in which she claims to have cleaned up after Mr. B and to have vacuumed his hair, Maubach Affidavit at ¶ 16, but plaintiff does not dispute that these complaints continued even after she vacuumed Mr. B's fur or dander. Furthermore, because plaintiff and her coworkers needed to be stationed in the EOC to answer 911 calls and to dispatch emergency assistance, there was no way to allow Mr. B in the EOC while also eliminating the risk of allergic reactions to employees. Although another

---

support is not a "service animal," and a disabled person has no entitlement to use the emotional support animal in public accommodations or in connection with public services.

If this case were a Title II or III case under the ADA, the analysis would be simple. Plaintiff's dog, Mr. B, is not trained to perform any particular task related to plaintiff's disability, and so Mr. B does not qualify as a service animal. *See* 28 C.F.R. § 35.104. Furthermore, even if Mr. B were properly trained, the DOJ's regulations relating to service animals specifically exclude emotional support animals such as Mr. B. *Id.* Therefore, if plaintiff's case were analyzed within the framework either of Title II or III of the ADA, plaintiff would have no right to bring Mr. B to the workplace as an accommodation for her disability.

Plaintiff's case, however, is not a Title II or III case; it is governed by Title I of the ADA, which prohibits discrimination against the disabled in employment. Title I has no specific regulations or guidance related to service animals or emotional support animals, and there is very little case law addressing the question whether an emotional support animal can qualify as a reasonable accommodation for a disabled employee. Here, it is assumed without deciding that an emotional support animal qualifies as a reasonable accommodation under Title I of the ADA. Thus, the inquiry turns to the reasonableness of the particular accommodation in the particular employment context, namely whether Mr. B's presence in the EOC as an emotional support animal for plaintiff is a reasonable accommodation for her disability or whether Mr. B's presence imposes an undue hardship on defendant given the context in which plaintiff works.

[7] If Mr. B were a service animal under Title II or III of the ADA, as he is not on this record, then allergies would not be sufficient on their own to justify barring Mr. B from public spaces. *See* 28 C.F.R. § 36.104. Title II and III of the ADA address the use of public spaces and public accommodation by the disabled, and if allergies were a sufficient justification to bar service animals from accompanying their owners in public accommodations, then because allergies are so common the disabled who use a service animal would be effectively barred from use of public accommodations. In the context of Title I, some jobs might be able to accommodate the presence of a service animal, and Title I's lack of definitive requirements with regard to service animals and other reasonable accommodations suggests that the inquiry must be context specific. As explained *infra*, allergies resulting from plaintiff's use of Mr. B in the enclosed EOC space, in this context, impose an undue hardship on other employees who use the space, and on defendant because it would be prohibitively expensive to build a separate EOC to be used either by the plaintiff or by the employees with allergies.

11

workplace might be able to give plaintiff or allergic employees a different work space, that is not an option here because it would be prohibitively expensive for defendant to provide a new EOC solely for plaintiff or solely for allergic employees.[8] Thus on this record, it is clear that plaintiff's insistence on Mr. B's presence imposed an undue hardship on defendant, as it required other employees to suffer from allergies. Accordingly, plaintiff's demand to have Mr. B in the EOC with her was not a reasonable accommodation.

The undisputed record also shows that on one occasion plaintiff had left her emergency response post without a proper substitute dispatcher, and thereby created a risk that emergency calls would be missed or that personnel would not be properly dispatched to the locations where they were needed. Although this problem might be alleviated by having plaintiff work the day-shift where there would be more dispatchers available to cover for plaintiff in the event she needed to take time off to address her disability, plaintiff refused to consider that as an alternative accommodation. In sum, plaintiff's demand to have Mr. B present with her in the EOC as an emotional support animal and as such, even assuming arguendo that plaintiff had engaged in the interactive process in good faith, her demand to have Mr. B with her in the EOC was not a reasonable accommodation under the particular circumstances of her employment.[9] Accordingly, summary judgment on plaintiff's failure to accommodate theory must be granted.

---

[8] Plaintiff's counsel at oral argument, asserted, for the first time, that an air filter could be installed to deal with Mr. B's fur and dander in the EOC. Yet, plaintiff did not cite any record evidence concerning whether an air filter would be sufficient or effective to eliminate the problem, and absent such evidence defendant's undue hardship claim stands essentially uncontested.

[9] Very few cases have addressed use of emotional support animals as a reasonable accommodation in the employment context. One district court in South Carolina, applying general principles related to reasonable accommodations under Title I of the ADA, has held that emotional support dogs might qualify as a reasonable accommodation and has allowed such a case to go to a jury. *See Clark v. School District Five of Lexington & Richland Cntys.*, 247 F.Supp.3d 734 (D. S.C. 2017). The facts of that case, however, are readily distinguishable, as the undisputed record in *Clark* demonstrated that "there were no reported problems caused by" the emotional support animal. Thus, unlike this case, the use of an emotional support animal as an accommodation in *Clark* did not impose any undue hardship on the employer. Furthermore, there was a genuine dispute of material fact in *Clark*

**B.**

In her second claim, plaintiff alleges she was terminated because of her disability. To establish a prima facie case of disability discrimination, plaintiff must establish (i) that she had a disability, (ii) that she was otherwise qualified for a dispatcher position, (iii) that plaintiff was terminated from her position, and (iv) that she was terminated because of her disability. *Reyazuddin*, 789 F.3d at 418-19.

Defendant argues that plaintiff was discharged because she was no longer qualified for her position given that a clinical psychologist had evaluated her as psychologically unfit for the emergency dispatcher position. Plaintiff does not dispute that a clinical psychologist examined her and that she was unfit to continue working as an emergency dispatcher. Instead, she argues that she was entitled to a second opinion. Nothing in the record shows that plaintiff was denied the opportunity to seek a second opinion on her medical fitness for duty, or that plaintiff was in any way precluded from seeking to present medical evidence in this case to rebut defendant's evaluation. In fact, the clinical psychologist who performed plaintiff's evaluation specifically told plaintiff she was "entitled to a second opinion." Maubach Dep. at 135:4-22. Plaintiff refused to seek a second evaluation because she did not believe the test results were relevant to her fitness for duty. *Id.* at 136:8-16.[10] Plaintiff's opinion that it is not a valid test to assess her psychological fitness for duty is not sufficient to raise an issue of fact, and she has not submitted any psychological or medical evidence to the contrary. Plaintiff's declaration that she was

---

as to whether the employer or the employee caused the breakdown in the interactive process for reaching an accommodation.

[10] Specifically, when plaintiff was asked why she had not sought a second opinion regarding her fitness for duty, plaintiff stated that "[c]onsidering that particular test seems to be irrelevant to any stress levels, which is what [Dr. Wires] flunked me on, it would be irrelevant for me to ask [my own doctors] for that test." Maubach Dep. at 136:12-16. Plaintiff's determination that Dr. Wires' test was irrelevant was based on her own research and her conclusion that the tests Dr. Wires performed as not stress tests. *Id.* at 134:18-135:3. Plaintiff's opinion that Dr. Wires' test was "irrelevant" to plaintiff's medical fitness for duty is not admissible or competent evidence with which to dispute a medical determination of fitness for duty.

medically fit to return to work, standing alone and without the support of any admissible record evidence, is not sufficient to create a triable issue of fact with respect to her fitness for duty at the time of her termination. As such, the undisputed record evidence demonstrates that, at the time she was terminated, plaintiff was medically unfit for duty as an emergency 911 dispatcher, and was therefore not a qualified individual within the meaning of the ADA. Accordingly, plaintiff's discriminatory discharge claim fails and summary judgment must be granted in favor of defendant.

For the foregoing reasons, defendant's motion for summary judgment must be granted. A separate Order will issue granting summary judgment in favor of defendant.

The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
April 30, 2018

/s/
T. S. Ellis, III
United States District Judge